IN THE UNITED STATES DISTRICT COURT
FOR
Baltimore Maryland 101 W Lombard Street, Baltimore, MD 21201

**WANT, Jerome**
511 W. Washington Street
Hagerstown, MD 21740
 Plaintiff

   v.

**Verizon Communications &Verizon of Maryland**            ]
13100 Columbian Pike
Silver Spring MD 20904

**Communications Workers of America**
501 Third Street NW
Washington, DC 20001

**Public Service Commission of Maryland**
6 St Paul Street 16th Fl
Baltimore, MD 21201

CASE NO.

_____FILED   _____ENTERED
_____LODGED  _____RECEIVED

AUG 1 9 2019

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
                              DEPUTY
BY

**GLR 19 CV 2392**

## STATEMENT OF CLAIM

Verizon Communications, through its wholly owned subsidiary, Verizon Media, (formerly, the wholly owned subsidiary known as Oath Communications which was the former wholly owned subsidiary of Verizon (aka V) known as Yahoo Communications has prevented the Plaintiff from conducting business by failing to transfer the email accounts and website after purchasing web hosting services from Yahoo in October 2018. The plaintiff was without these services for a **five (5) month** period at the most critical time of year for consultants, November to January, which is when consultants are approached for proposals  for the following year and when consultants notify companies of their services.   Attempts to obtain support from the highest levels of the company, Oath inc. at that time, failed after spending  days on the phone

1

with incompetent representatives in the US, India and other parts of the globe who never restored the hosting.

Further and separately, V residence service cut off residence service to the Plaintiff at his home allegedly for being rude. In fact, the defendant repeatedly failed to correct problems with his residence service after more than two dozen requests for help. Specifically, the plaintiff had asked for a non-listed number to prevent sellers and robo callers from contacting him at his home number (Plaintiff was receiving up to 7-8 robo calls per hour at times). CS reps were especially rude, deliberately unhelpful, racist and obstructionist, especially when dealing with reps in NYC. They refused to non list the number saying they had no such request in their record. Since he became a management consultant more than thirty years earlier, he has ALWAYS had his residence service **unlisted**. The only help provided was from an individual in the MA. CS Office, but, in the end, they never followed through as promised to have his number unlisted. **DAMAGES** are demanded in the amount of $2,852,520 **plus punitive damages as outlined below** from Verizon. $1,000,000 in damages are demanded from the Maryland Public Service Commission for not protecting the rights of the consumer as outlined in their mission statement, and $1,000,000 as outlined from the Communications Workers of America.

## VENUE

Due to diversity of the parties and that two of the three parties are domiciled in Maryland and as Federal issues are involved, this court is the proper venue for this matter.

## BACKGROUND

In March and April, 2017, the Plaintiff attempted to order and have installed Verizon phone and internet service with Verizon at a former address. Each of the fourteen (14) times that he called, he was either disconnected or subjected to no less than a forty five minute

process to apply over the phone for that service–after waiting on hold for never less than thirty (30) minutes). Seven times, the order was approved but after each approval process and promise that "you will receive a call notifying you when your service will be installed." no one called to schedule service and service was not installed. Each time that the Plaintiff called back to obtain an installation date and time, he was told that "your order was lost" or "we have no record of it or some similar statement from the representative and that Plaintiff had to apply all over again. Plaintiff, finally contacted Kenneth Dixon (EVP of customer service operations) and Lowell McAdam's (CEO) via writing to HQ office in New York. Only then was the service approved and finally installed with the installation fees being waived given the HUGE inconvenience caused by Verizon personnel. When the plaintiff did complete the order, he made clear that the service was to be **non-listed.** Nevertheless, it was always listed. At this point, it should be noted, that before he was seriously injured and disabled eight years earlier, preventing him from working, Plaintiff was a leading change strategy, organization and management effectiveness consultant to a number of industries, MOST ESPECIALLY TO THE TELECOM INDUSTRY, as he consulted at various times to six of the original seven Baby Bells and other non Bell companies and their CEOs and other senior executives. The lone exception was NYNEX which became Verizon (after acquiring Bell Atlantic). Want had conducted the first corporate culture audit and change planning engagement for a Bell company (US West) after the divestiture of AT&T as well as similar consulting to other telecom companies. Plaintiff DID know former CEO Ivan Seidenburg to whom he had advised on issues related to leadership team effectiveness consulting based on the referral by the entire leadership team at Bell Atlantic. Plaintiff understands the cultures of these large telecom organizations and how they function. Interestingly, in the same period, Plaintiff had another encounter with Verizon/Bell Atlantic which is germane to this complaint. While living in the NY area, Want required open heart surgery and moved into the home of a family member in northern New Jersey to the third floor where that family could take meals to him and help him up and down the stairs to the third floor

level where he resided for his recovery. He made numerous calls to the phone company at that time to have phone service installed on that third floor before his surgery so that he would not be stranded. No one from the company came to install the service for any of the promised dates over a two week period. At the last minute, the family had to leave town for a family emergency leaving the Plaintiff alone on the third floor after his surgery (it took him ten full minutes to climb to the third floor --typical of open heart surgery patients). Want was even calling from his hospital bed to senior executives to have the phone installed. It was not installed until after he was home from his surgery. That was accomplished only after calling Kevin Pennington, EVP of HR at Bell Atlantic who was horrified by the company's failures. Plaintiff also called the secretary of CEO Ivan Seidenburg of NYNEX, Judy Michelle, who was also shocked and who tried to assist, but again, the phone was not installed for several days after plaintiff returned to the hospital (Plaintiff left front door unlocked with a note on it for V installers to let themselves in since he could not walk the steps himself).

When Plaintiff set up service in 2016, he specifically ordered that his phone number NOT be listed. In the course of the past year, Want made a number of complaints to the Maryland Public Service Commission (PSC), after failed calls to Verizon, asking for his phone number to be **changed** as he was being overwhelmed with spam calls (even interrupting calls while he was on other calls). Like the feckless bureaucracy that it is, the PSC did **nothing.** Verizon DID initiate a complaint against Want for supposedly being rude and abusive to Verizon personnel when calling (that will be addressed later).

On or about November 19, Plaintiff called Verizon and asked that the service be moved to a different address. While attempting to move his service, an attempt was made to obtain a . different number (and one easy to remember for himself and for a family member who was developmentally disabled who called him). At that time it was learned from the V rep. that <u>his number was never unlisted and "it was too late to un-list it for the upcoming year."</u> He had been told that he could have the number changed without any additional costs within thirty (30)days of setting new service. The numbers offered were not satisfactory and a later call would be

4

made to V for a new set of numbers from which to choose. During that call, the rep made clear that Want was listed as an "excellent" customer as he has paid his bills in a timely manner. That particular rep was located in the Massachusetts calling center. The V people in MA are clearly more helpful—when you can reach them—than those in NY. Not so in other cases as will be described.

Service was to be started at the new address on Saturday, November 24 according to the rep in Massachusetts. No one from Verizon came. Want was able to connect the phone to a jack at the new address, but he had no internet which was critical. Want called V and was only able to reach a recorded line that stated that "your service is scheduled to be installed no later than Monday, November 26." Also on that Saturday, the 24th, Want called separately and received people in the Philippines who did not seem to understand that he wanted to change his number to something more easily remembered and to confirm that service would start on Monday 26th. After several more calls, Want reached someone in the Phillippines who did seem to understand English and who seemed to t know what to do. She gave the Plaintiff several numbers from which to choose for his new number and he chose 301-797-4226 (this was similar to his old number and it was an exchange from Hagerstown). The rep she said she would send it in. Unknown to Want was the fact that the former rep from MA assigned a random number (301) 739-7175 but did not report it to Want. Plaintiff happened to call his primary care physician on Monday, the 26th and had to learn from him what his number was. Unknown to the Plaintiff, the physician had been trying to reach Want for several days but could not.

Want waited around on Monday and no one from Verizon came. Neither was internet working. He called again and received the recorded line which this time said service would be started on Tues, the 27th. He waited around again but no one from Verizon came to install service. He and a family member also call the local business office but he received no assistance. He and a family member kept calling for the next several days, always receiving people in India or the Philippines who did not seem to understand what to do and it became clear that they were not connected in to the US. On about Wed. the 28th, plaintiff reached a "Louis" in

5

NY and explained the problems–no connection and no new number. It was at that time that he was told by Louis that he had a randomly assigned a number, which Plaintiff did not know about, and what it was. Want had been told by a rep in the Philippines that the number that he had requested would be assigned, but it was not. Louis promised to get the problems straightened out, and Louis said he would definitely connect him to someone in the US who would correct the problems. Want asked Louis to stay on the line and to not connect him to the Philippines. Louis did not stay on the line and he connected Want to a recording which said he had an eighteen to twenty one minute wait or be called back in that period of time. After an hour and a half of waiting, Want received no call back. This continued to the end of the week. On the 28th, a rep in NY was reached "Vicki" who would not help and who steadfastly refused to connect Want to a supervisor (in MA. reps were willing to connect to a supervisor but not NY reps). Later, a call was again made and this time it was accepted by a Brandy, in NY, who was also insistent on not getting a supervisor. By this time, Want and a family member had made at least thirty calls to V most of the time not receiving anyone to help or receiving people overseas who did not know how to help. These foreign reps were absolutely incompetent and not understanding of the issues.

On the 28th, Want reached a Mr. Yarmworth, in the Hagerstown area, who had come out at a previous address to ensure proper installation.. Yarmouth was clearly unwilling to help and he insisted that he record the conversation. Neither did his supervisor, Donald Townes, indicate any willingness to help and HE was sent out in the spring of 2017 to make sure that that installation was made correctly at that time given all of the failures. AS IT TYPICAL WITH FROZEN BUREAUCRATIC ORGANIZATIONS, they will continue to make mistakes but they no longer are responsive later to customer legitimate complaints (see appendix A) and they become PREDATORY as they retaliate against customers.

On the morning of the 29th, Want received an overnight letter from a V attorney, on V letterhead with **no** return address or phone, noting that his service was being cut off on December 12 for abusing V reps. With no internet, Want had already run up a large bill for just

calling directory assistance for numbers. In attempting to obtain a number for corporate at V, a directory assistance operator said there was none listed but what was the issue. She had the good sense to connect Want to "Executive Escalations." Want reached one person there who was willing to help to get internet restored, for at least the week he had left. She worked diligently on the matter and could completely understand the problems plaintiff was having, especially since the plaintiff is DISABLED PER THE AMERICANS WITH DISABILITIES ACT OF 1991. Several medical professionals have declared the Plaintiff disable for his spinal injuries (and other injuries to the spine and torso) as well as for having part of a lower limb amputated in just the past year (Appendix II). Want was also troubled by a virulent MRSA virus which required surgery and had not yet healed four months later which will probably require another course of antibiotic infusion therapy and surgery. When Want fractured his spine, he had to give up his car to his company, but he expected to have another after his case was settled( not surprisingly, the attorney abandoned the case without telling Want after Want relocated to Hagerstown to oversee the care of an invalid family member as Want could no longer work. That attorney had a reputation for abandoning PI cases and had been disciplined for it). AS SUCH, Want has been limited to the local bus service (not at all satisfactory) and walking when he could (but no longer given increasing problems with his back and having had part of a lower limb amputated). Therefore, Want is even more reliant on his internet connection. Additionally, Want was warned by the V attorney, that he should not attempt to have internet service connected (Appendix 3)

    Despite his limitations, Want has been attempting to obtain consulting (as he can use car service and airplanes paid for by clients) as his financial situation has deteriorated along with his health. An interim service by a local company could not keep service connected for Want due to incompetence typical of the merchants/service providers in this area. Plaintiff can no longer do this without internet and phone. Other problems that have been created include:

1. Not being able to down load postage labels such as Priority Mail from the USPS Click N Ship site. Plaintiff cannot easily go to the PO and cannot stand in line which is always long and then

walk home..

2. He cannot shop on line. It is nearly impossible to shop on line via the internet as he has had to go to the library which is actually too far to walk.

3. He cannot connect to an invalid family member via internet and soon will also be without phone. A cell phone does not work for Want as his office style phone at home has stored numbers for easy access and dialing.

4. Want's PCP wanted him to be able to connect via internet, as he has in the past, for medical updates after hours as office hours are not good times to talk on the phone

5. He cannot do any kind of research without the internet which he uses for writing articles and books (Plaintiff has authored and had published three business books, one of which was published just last year and another was a past best seller).

6. He cannot even find the contact information for companies or research executive staff for marketing purposes as he has in the past

7, Plaintiff has always used the internet to reserve a para-transit to get around town. Now he cannot connect to them to make such reservations making it more difficult to do via phone.

8. No company could find Plaintiff's website from November to mid March and Plaintiff did not have any business webmail to contact companies for that period.

**The consequences to the Plaintiff have been catastrophic.**

Plaintiff cannot:

1  Conduct online banking and just the previous night, overdrew his account incurring a penalty fee. Plaintiff has not overdrawn an account in several years.

2  Connect with care givers to an invalid family member to monitor her care and condition.

3. Engage in online shopping which is critical to the plaintiff as a disabled American who is limited in how much shopping he can do at brick and mortar stores.

4. Research online, especially for business marketing.

5. Connect with friends and family.

6.  Reserve para-transit which is critical as the company does not like leaving messages

8

and the voice notification frequently cuts out with scheduled pick up times.

7. Pay bills on line

8. Keep in contact with physicians, especially PCP who does not have time during his practice hours during the day to talk. This allows him to give instructions over the phone and to send and receive confidential documents with patients which he prefers.

9. **Communicate with prospective clients or do any marketing/ research to obtain consulting.**

10. Send proposals etc to prospective clients and allow them to email questions.

## COMPLAINT

COMES NOW THE PLAINTIFF, Jerome Want, with his complaint against Verizon et al for the following violations and offenses:

COUNT 1.  Breach of contract   Verizon has a contractual obligation to provide more than just dial tone. It is obligated to provide reliable and on time connection and **support** service to its customers especially for the installation and maintenance of service which it has failed to do.

COUNT 2.  Malfeasance   Verizon and its employees have repeatedly and knowingly failed to provide competent, accurate and reliable service to correct problems causing harm to the Plaintiff.

COUNT 3.  Retaliation   Verizon personnel, especially in its customer service operations and in their Maryland and local area offices have retaliated against Want for making legitimate complaints— complaints made in a proper and professional manner. Nevertheless, their constant malfeasance and negligence and their suspension of internet without notice clearly constitutes **retaliation** which is in violation of FCC Code and ADA rules.   After a long history of errors and deliberate retaliation, this customer has reached the end of his patience. As an expert on corporate culture, especially within the telecom industry, the plaintiff is well aware that people within companies engage in what is called "projection of blame," a moderately severe psychoneurotic defense mechanism that plagues most work places and especially Frozen and Predatory business cultures (see Exhibit 1) such as Verizon.

high school. He later developed and led a special school and mental health treatment center for children and teens from a hard core inner city school district which received national recognition. Racism is not limited to one race.

COUNT 9. Restraint of Trade by suspending service, especially internet service, the defendant denied the plaintiff his right to seek and maintain work. Much of what the plaintiff is now able to do involves editing and writing books (though he has no contract to do so within the seventeen months). **More important,** defendant failed to properly migrate his business internet site and webmail to Yahoo. He lost years of webmail contacts. In addition, Plaintiff is attempting to obtain consulting to regain a measure of independence. The internet is also necessary to send proposals technical information etc. (business of this kind is now conducted over the internet—not via the mails).

COUNT 10. Violation of First Amendment Rights By denying the plaintiff access to the internet, the defendant violates plaintiff's rights to free expression and communication with others.

## DAMAGES

Plaintiff now petitions this court to award the following damages.

Compensatory damages in the amount of $252,478 (including for phone service of past twenty months)

| | | |
|---|---|---|
| Punitive damages in the amount of | $2,000,000,000 | for lost consulting opportunities for a |
| total of | $2,000,252,478 | |
| from Verizon Communications AND | $1,000,000 in damages from the CWA AND another | |

$1,000,000 from the Maryland Public Service Commission for its failure to protect this consumer. Court costs are also demanded.

**Courts are now considering "reprehensibility"** in claims as in State Farm v. Campbell (2013). This amount is not excessive in light of the defendant's overall profits and income calculated in the hundreds of billions and how they have done absolutely nothing to improve its culture and especially its CUSTOMER SERVICE. As such, the Plaintiff demands $1,000,

000,000 for their repeated and persistent reprehensible conduct. It must serve as a warning to such "beyond human scale companies" that their size does not give them the right to act recklessly and outside the public good while trying to hide behind tariffs of each state which they lobby legislatures to enact.

Respectfully submitted,

*[signature]*

Jerome Want, PhD. Plaintiff
August 16, 2019